IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs June 2, 2015

**STATE OF TENNESSEE v. KEVIN LADELL GRANDBERRY**

**Appeal from the Circuit Court for Fayette County**
**No. 13-CR-177     J. Weber McCraw, Judge**

---

**No. W2014-01549-CCA-R3-CD  -  Filed August 26, 2015**

---

A Fayette County jury convicted the Defendant, Kevin Ladell Grandberry, of burglary, theft of property valued at $500 or more but less than $1,000, vandalism less than $500, and theft of a motor vehicle valued at $1,000 or more but less than $10,000.  After a sentencing hearing, the trial court sentenced the Defendant as a career offender to a total effective sentence of twenty-seven years in the Department of Correction.  On appeal, the Defendant contends that the trial court erred when it ordered the Defendant to be shackled and handcuffed during the trial and that the evidence is insufficient to sustain his convictions.  After a thorough review of the record and applicable law, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which D. KELLY THOMAS, JR., and ROBERT L. HOLLOWAY, JR., JJ., joined.

George D. Norton, Jr., Selmer, Tennessee, for the appellant, Kevin Ladell Grandberry.

Herbert H. Slatery III, Attorney General and Reporter; M. Todd Ridley, Assistant Attorney General; D. Michael Dunavant, District Attorney General; and Catherine Walsh, Julie K. Pillow, and Mark Davidson, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**

This case arises from the break-in and theft of property that occurred at the Gas Express in Somerville, Tennessee.  A Fayette County grand jury indicted the Defendant for burglary, theft of property valued at $1,000 or more but less than $10,000, vandalism

less than $500, and theft of a motor vehicle valued at $1,000 or more but less than $10,000.

On March 27, 2014, the Defendant filed a motion requesting that the trial court allow him to be unshackled during his trial, and the State opposed the motion. At a hearing on the motion, Scott Miller, employed by the Department of Correction, testified about the procedures used to log disciplinary issues in state penal facilities. Mr. Miller identified the Defendant's complete inmate disciplinary record. He confirmed that the Defendant had multiple disciplinary infractions that were "violent in nature," including: an August 20, 2008 assault on a prison facility staff member, a November 16, 2006 fight with an inmate, an April 28, 2004 possession of security threat material, a March 2, 2004 assault on a facility staff member, a June 13, 2001 fight with an inmate, an April 1999 fight with an inmate, a March 1999 fight with an inmate, an August 10, 1998 possession of a deadly weapon, and five "creating disturbances." Additionally, the record indicated that the Defendant threatened a facility employee on two occasions. The trial court admitted into evidence the Defendant's disciplinary record and detailed accounts of the incidents above listed.

Mr. Miller testified that, with regard to the August 20, 2008 incident, the Defendant "repeatedly punched a female officer in the face with his fists." The April 28, 2004 incident involved the Defendant's possession of gang material in the facility, and the March 2, 2004 incident related to the Defendant striking a staff member on the head, which resulted in injury. Mr. Miller clarified that the Defendant was twice cited for possession of a deadly weapon: once, on May 10, 1999, when the Defendant had a nine-inch "shank" hidden in his mattress, and again on August 10, 1998, when he possessed a seven-inch "homemade knife." About the incidences when the Defendant threatened facility employees, Mr. Miller stated that the Defendant threatened to spit in one employee's face, and, on the other occasion, the Defendant "used profanity and stated he was going to shoot and cut her throat." The Defendant also threatened to kill this employee's family members.

Frances Turner, a Fayette County Sheriff's Department employee, testified that she maintained inmate records. Ms. Turner identified Fayette County Sheriff's Department incident reports for: April 28, 2013, involving the Defendant's assault on a staff member, August 13, 2013, for destruction of property and failure to follow rules, and February 10, 2014, for assault of another inmate. Both assaults resulted in the victims receiving medical treatment.

Anthony Grandberry testified that while an inmate in the Fayette County jail he came in contact with the Defendant. He explained that he and the Defendant were related on his "father's side." Mr. Grandberry recounted a conversation with the Defendant, who

2

disclosed that he planned to break out of jail with the use of a bar he had loosened on the bathroom wall. The Defendant planned to "bust the window out of the pod" and "out the control," to escape. If his escape was successful, he planned to "hurt his sister and his brother and his brother-in-law." Mr. Grandberry stated that in order to escape he would need to "choke" or "harm" the officer "in the bubble." Believing that the Defendant was serious about this plan, Mr. Grandberry told a Tennessee Bureau of Investigation ("TBI") agent.

The State submitted as an exhibit a Lauderdale County indictment charging the Defendant with first degree premeditated murder, first degree felony murder, especially aggravated robbery, attempted first degree murder, employing a firearm during the commission of a dangerous felony, a prior felony conviction, felony possession of a weapon, and theft of property valued between $1,000 and $10,000. The State also submitted judgment forms for the Defendant's prior convictions, which included convictions for escape, aggravated robbery, theft of property, evading arrest, and two aggravated assaults. A certified copy of the warrants were also submitted and indicated that one of the aggravated assault convictions was based on the Defendant's attacking a guard at the Tipton County jail with a shank. The other aggravated assault conviction was with regard to the Defendant's attempt to hit an officer with his vehicle while attempting to flee from the police.

At a subsequent hearing on the same motion, David Webb, a Fayette County Sheriff's Department investigator, testified that he had observed a two-foot safety bar next to the toilet in the Defendant's cell that had been loosened. He said that one of the screws that held the bar to the wall had been removed and was lying on the floor. Another screw was loose and "had been somewhat pulled out from the wall." Officer Webb confirmed that the Defendant was the only inmate residing in that cell. Officer Webb identified photographs that he had taken of the loosened metal bar in the Defendant's cell.

After hearing the evidence, the trial court made the following findings when it denied the Petitioner's motion:

> With regard to this matter regarding security concerns, the Court is going to make the following finding[s] of fact. The Court listened to the testimony and now goes through the exhibits. Exhibit 1 was introduced by someone from the Department of Corrections [sic], I believe, and in it, it has the disciplinary history of [the Defendant]. In that history, there is an assault on staff while [the Defendant] was incarcerated and he became angry and assaulted some staff, punched her in the face with his fists.

3

There's also other incidences of fighting, other incidences of assault on staff. There's also contained in the disciplinary file other incidences of possession of material that posed a security threat. There are numerous incidences of creating a disturbance and fighting while incarcerated. There is an incidence of [the Defendant], while in custody, being in possession of a deadly weapon, that being a nine-inch shank which was hidden under his mattress.

There is another incidence while in custody of being in possession of a deadly weapon, that being another homemade knife, about a seven-inch blade consisting of two metal pieces that had been sharpened at the end and wrapped in some type of tape. There are other incidences of him threatening employees while incarcerated.

Further, in the exhibits while being housed here in Fayette County there is an assault on staff. There [are] fighting incidents. There is an incidence also while he was here in Fayette County in April where he attacked an officer while in custody. There is a disciplinary incidence while in Fayette County from August, 2013, where there is destruction and damage to property. There was failure to follow the rules and the orders and also charged with hindering an employee in his duties. Once again, [the Defendant] posed a threat and created a dangerous situation. In February, 2014, there is an incidence with another inmate where he attacked an inmate and, again, there was a fight and he assaulted another inmate.

There is also in the exhibits that were admitted during the hearing where he has been indicted for first degree premeditated murder, felony murder, attempted first degree murder, employing a firearm during the commission of a felony. There is also as an exhibit judgment sheets where [the Defendant] was found guilty, in fact, pled guilty to an escape, to an aggravated robbery, to an aggravated assault, again - and also an assault, again incidences of [the Defendant] being a violent person.

Also, there are contained judgment sheets from Haywood County Court where again [the Defendant] was found guilty and, in fact, pled guilty to an aggravated assault, to evading arrest. Again, those are incidences where [the Defendant] has exhibited violent behavior, also behavior which indicates that he would be a flight risk.

4

Also, there was testimony during the hearing of someone who I believe was housed with [the Defendant], in fact, is, from what I recollect, a family member of [the Defendant], which indicated [the Defendant] indicated there would be problems at his trial, that he testified that [the Defendant] indicated that he would try to create a weapon from his cell, which the Court finds that witness to be a credible witness, that [the Defendant] has verbalized that there would be problems during his trial.

After that testimony and after the hearing and it's been submitted today, the next exhibit which has a picture of the cell which, in fact, shows that a metal bar which is contained in the cell appears to be a couple of feet long, there's been [an] attempt to remove that. There are some screws removed from the wall, that testimony is it's been loosened. All of those are in furtherance of what the witness indicated that he would attempt to use a weapon, so, again, as to the credibility of that witness, it appears that a weapon was being contemplated by [the Defendant].

So, the Court, from all of those exhibits and the testimony, does find that [the Defendant] is a dangerous person, that he poses a threat during trial, that not only does he have this trial pending here, then he has an even more serious trial in Lauderdale County where he is charged with murder. Certainly, [the Defendant] would be motivated to continue to pose a risk pending the greater charges he has in other courts.

So this Court does find that [the Defendant] is to be considered a great danger certainly to the personnel and the Court but also to the jury. As configured in the courtroom, [the Defendant] would be in close proximity of the jury and even though the Court has certain security measures, including shock devices and beefed-up security, which all will be implemented, [the Defendant] still poses as a risk, that any quick, sudden movement by him could not be anticipated if all the security has been gathered in the courtroom.

So the Court finds that in order to protect all people in the courtroom, including the lawyers, particularly [the Defendant]'s lawyer who he will be sitting next to, and to protect the jury, that even further restraints are needed. So the Court is going to order that the [D]efendant, [ ], be shackled during the trial. The Court is going to order that the shackles not only be on his feet but he will also be handcuffed during the duration of the trial. The cuffs need to be situated so that his hands are also fastened to his waist so that he cannot use his hands or the cuffs as a weapon. All this

5

appears to be supported by State of Tennessee v. Hurt, which is a 2007 appellate case. The Court has looked to all other methods in order to protect all parties involved and they do not appear to be adequate unless [the Defendant] has his hands confined so that he cannot use them as a weapon.

It will also be ordered that the Sheriff's Department use whatever is in its ability to - I think it's been contemplated having some type of cloth on the table so that [the Defendant]'s restraints can't be noticed by the jury. Should somehow they be noticed, the Court will give further instruction, but all efforts are to be made to make certain that the jury does not see that he is restrained.

The Defendant's trial was held on April 7 and 8, 2014. Billy Raymond, a Somerville Police Department officer, testified that on November 21, 2012, he was patrolling a business area where there had been recent burglaries. At 2:50 a.m., another officer notified Officer Raymond that the front door of the Gas Express had been "busted out." Officer Raymond stated that five or six minutes before receiving this call, he had driven through the Gas Express parking lot and the building appeared secure. Officer Raymond drove to the Gas Express and observed the glass from the front door of the business had been broken out. Upon further investigation, Officer Raymond found that a rock had been thrown through the front door "completely" breaking the glass from the door frame.

Officer Raymond identified photographs of one of the cash registers that had been opened and the money removed. He stated that there was another cash register that had been taken from the business. Officer Raymond recalled that at around 2:30 a.m., shortly before he received the call notifying him of the burglary, he observed a blue truck, that he was unfamiliar with, "riding around." As he waited at the Gas Express for the owner to arrive, he noticed a blue truck back into the Q Inn parking lot. Officer Raymond drove to the Q Inn, approximately sixty yards away, and approached the man who had exited the truck. This man stated that his name was Rolando Horne, he was from Mason, and he was renting a room because "his alternator had messed up on his vehicle."

Officer Raymond testified that Mr. Horne consented to a search of his vehicle and Officer Raymond found "some hoodies" and a bill of sale for the truck naming "Kevin Grandberry" as the owner. Mr. Horne told Officer Raymond that the owner of the truck was a black male who was six feet tall, 230 pounds, bald and wearing a dark hoodie, blue jeans, and white tennis shoes. Officer Raymond said this description was distributed to local law enforcement, and Deputy DuPriest responded that he had observed a subject fitting the description on Market Street and Northwest Street. While patrolling this area,

6

a sheriff's deputy found a cash register located on the northwest corner of the Somerville library. The cash register was later identified as the one taken from the Gas Express.

On cross-examination, Officer Raymond confirmed that Mr. Horne had told him that he was going inside the hotel office to rent a room, which Officer Raymond later found was not true. Mr. Horne's statement about his alternator was also later determined to be untrue. Officer Raymond recalled that Mr. Horne stated that he was waiting on his brother-in-law and sister to come pick him up. When asked his brother-in-law's name, Mr. Horne responded, "I don't know his name." Mr. Horne further stated that he did not notice "anything about the Gas Express" because he fell asleep in his truck while waiting for his brother-in-law. When asked where his brother-in-law was, Mr. Horne said that his brother-in-law had gone to a gas station to call Mr. Horne's sister who was to come and pick up the two men. Officer Raymond agreed that Mr. Horne made inconsistent statements.

Officer Raymond testified that Mr. Horne eventually admitted that he had dropped off the Defendant and then fallen asleep in the truck. Officer Raymond stated that Mr. Horne did not appear to be under the influence of alcohol or drugs at the time of his statements. Further, Mr. Horne did not appear to have just been asleep when Officer Raymond spoke with him.

Ken Crawford, a Somerville Police Department officer, testified that, on November 21, 2012, he and Officer Raymond were patrolling a business area of town where there had been multiple burglaries. He explained that each of the officers, in separate vehicles, would drive opposite directions down the same portion of road surveying the convenience stores. They began the patrol of this area at approximately 8:00 p.m. on November 20 when the last business closed. When heading west, the officers would turn around in the parking lot of the Gas Express and, when driving east, the officers would turn around at "Valero."

Officer Crawford testified that during his patrol of the area he found "a busted door" at the Gas Express. Upon finding the broken door, Officer Crawford notified dispatch, and Officer Raymond arrived at the scene shortly thereafter. The two officers entered the Gas Express and "cleared the building." After finding no one inside the Gas Express, the two officers went outside and waited for an investigator, David Presley, and the building owner to arrive. As the officers waited outside, they discussed a blue truck that both officers had seen earlier. Officer Crawford had never seen this particular blue truck before, so it struck him as "kind of odd" for the blue truck to be out driving at that time of the morning on a Wednesday. He said that he saw the blue truck two times and that there was a driver and a passenger inside the truck. As the officers talked, Officer Raymond noticed a blue truck backing in at the Q Inn. Both officers agreed that the blue

truck backing in at the Q Inn was the same truck that each of the officers had seen earlier while patrolling the area.

Officer Crawford testified that he remained at the scene to secure the building while Officer Raymond went to the Q Inn to speak with the driver of the blue truck. Officer Crawford joined Officer Raymond briefly while Officer Raymond searched the blue truck and then returned to the Gas Express.

Amir Sourti, the Gas Express owner, testified that he closed the Gas Express store at 9:00 p.m. on November 20, 2012. He recalled that, in the store that night, he had left $5,000 in a green pouch, "some change," and approximately five hundred dollars in "[t]he white register." At approximately 3:00 a.m., he received a telephone call from the police notifying him that he should go to his store. When he arrived, he found that the front glass door had been broken and that the cash and one of his cash registers had been taken. Mr. Sourti confirmed that he had not given anyone permission to enter his store or take anything from the store.

Mr. Sourti testified that police officers returned the white cash register to him but that it was damaged and inoperable. He stated that the white cash register was worth "around six hundred dollar[s]." Mr. Sourti said that, after the break-in, he found that ten $10 phone cards, ten $15 phone cards, and ten $50 phone cards were missing. Also taken was a box containing fifty cartons of cigarettes with each carton valued at $50. Mr. Sourti confirmed that the surveillance system at the Gas Express was not working at the time of this incident.

On cross-examination, Mr. Sourti confirmed that, other than the damaged cash register, he did not recover any of the property stolen from his business. Mr. Sourti agreed that "quite a bit of items" were taken, making it "difficult" for one person to carry out of the store. Mr. Sourti estimated that, after being notified that he needed to go to his store, it took him approximately forty minutes to get there. Mr. Sourti said that he, his wife, and one employee worked at the store. He agreed that all three of them knew about the green pouch containing $5,000.

Christy DuPriest, a Fayette County Sheriff's Office deputy, testified that, early on the morning of November 21, 2012, she reported to the Gas Express in Somerville, Tennessee. Deputy DuPriest surveyed the area around the Gas Express for persons involved in the burglary. As she drove on streets in the same vicinity, she observed the Defendant standing in front of a building near the Somerville library. She had a description of a six foot tall black male in his thirties as a suspect. She explained that at 3:00 a.m. in Somerville, Tennessee, there are not many people "roaming" the streets. She said that she made direct eye contact with the Defendant before "he took off beside the

building." Because she was alone, Deputy DuPriest did not pursue the Defendant. She testified that she notified other officers and waited for assistance before canvassing the area. Deputy DuPriest did not see the Defendant again that night, but she did find a cash register on the back western corner of the Somerville library.

On cross-examination, Deputy DuPriest testified that the dispatch log indicated that she communicated on the radio that she would be checking the area around the Gas Express at 3:08 a.m., and she notified dispatch that she had located the suspect at 3:14 a.m. She confirmed that during the search of the area, other than the cash register, no other items taken during the burglary were recovered. Deputy DuPriest confirmed that another officer showed her a photograph of the Defendant with his name written on the photograph, and she confirmed that the man in the photograph was the same man she had seen that morning. Deputy DuPriest estimated that she was approximately fifteen feet away from the Defendant when she saw him.

Billy Carroll testified that he sells cars at Mid-City Auto Sales. He recalled that, on November 17, 2012, he met with the Defendant who was interested in buying a truck. Mr. Carroll recalled that another man was with the Defendant but that he only dealt with the Defendant during the course of their negotiation that day. Mr. Carroll sold the Defendant a blue Chevrolet truck. He identified a photograph of the blue truck that he had sold to the Defendant. Mr. Carroll stated that the Defendant had paid five hundred dollars toward the price of the truck and an additional three hundred dollars in sales tax in cash on the day of the sale. He identified several documents signed by the Defendant as part of the paperwork completed for the sale.

Mr. Carroll testified that the Defendant returned to Mid-City Auto Sales about a week later to purchase a 1999 blue Tahoe. Mr. Carroll identified the bill of sale for the Tahoe, which was dated November 26, 2012. Mr. Carroll recalled that the Defendant paid the full amount for the vehicle, $3,300, in cash. The Defendant told Mr. Carroll that his sister had the blue truck and that he was buying the Tahoe to give to his sister so he could have the blue truck again. Mr. Carroll later learned that the Defendant's sister did not have the blue truck but that the blue truck had been impounded. Mr. Carroll recovered the blue truck from an impound lot.

On cross-examination, Mr. Carroll testified that the Defendant borrowed the money for the sales tax owed on the truck from the man that was with him. He confirmed that the Defendant did not list an employer on the application for credit for the blue truck. On the subsequent purchase of the Tahoe, the Defendant paid in full, so he did not fill out an application for credit.

9

Vanessa Shepherd testified that she owned a 1990 red GMC pickup and estimated the value of the truck at "over a thousand but under ten thousand." Ms. Shepherd lived in the area near the Gas Express in Somerville, Tennessee. On November 20, 2012, she parked her truck outside her residence at 9:00 or 10:00 p.m. At 7:00 a.m. the following morning, she was awakened by police knocking at her front door. A police officer informed Ms. Shepherd that her truck had been stolen. She walked out to the area where she had parked the truck the night before and found a Mag flashlight and broken glass. Ms. Shepherd confirmed that she had not given anyone permission to take her truck. Ms. Shepherd testified that her truck was later recovered but that there was damage to the steering column.

Clyde Buffalo testified that he is a "regular customer" at Bull Market and "the first customer of the day" on most mornings. One morning in November, after Mr. Buffalo had left work at the Kroger grocery store in Oakland, he arrived at the Bull Market at approximately 6:05 a.m. Mr. Buffalo drove to the area where he normally parked and saw a red pickup truck next to the "drive-thru." The State showed Mr. Buffalo a photograph of Ms. Shepherd's red GMC pickup, and he confirmed that it was the same truck he had seen at the Bull Market. He recalled that a "light-skinned black" man, approximately 5'10" and weighing 180 to 200 pounds, was standing between the truck and the drive-thru window. The two men made eye contact, the man standing by the red truck "seemed to hesitate," and then he "jumped in his truck and took off" driving toward Whiteville, Tennessee.

Rolando Horne testified that he lived at the Village Apartments with his girlfriend, "Victoria," who was also the Defendant's sister. Mr. Horne said that in November 2012, the Defendant asked him to go with him "to [ ] pick up a girl." Mr. Horne agreed, and the two men drove to Somerville, Tennessee in a blue truck. Mr. Horne recalled that the Defendant had bought the blue truck "a couple days before." Mr. Horne and the Defendant drove around Somerville trying to find "the girl['s]" house when the blue truck "started acting up." Mr. Horne explained that the truck's headlights were dimming, so the Defendant pulled into a motel parking lot. Mr. Horne used the telephone there to call his girlfriend to come and get the two men. After calling his girlfriend, Mr. Horne got back in the blue truck, and the two men waited for their ride. After ten or fifteen minutes of waiting in the truck, Mr. Horne fell asleep but woke up when he heard an alarm. Mr. Horne got out of the truck and heard police officers talking about the blue truck. The police officers approached Mr. Horne and asked about his involvement in the burglary. Mr. Horne denied involvement in the burglary, and he explained to the police officers that the blue truck had broken down and that he was waiting for his ride.

Mr. Horne testified that he told the police officers he was looking for his brother-in-law, and he provided the Defendant's name. Mr. Horne testified that he did not know

10

where the Defendant had gone, but he provided police officers with a description of the Defendant. He also consented to a search of the blue truck. Mr. Horne stated that the police officers took him to jail, and he was initially charged in this case but was later released. Mr. Horne denied any knowledge that the Defendant intended to break into the Gas Express. He further denied that the two men ever drove through the parking lot of the Gas Express. He agreed that the Gas Express and the motel parking lot where he waited for his girlfriend were in close proximity to one another.

On cross-examination, Mr. Horne testified that he was with the Defendant when the Defendant purchased the blue truck in Covington, Tennessee. He recalled that the two men went to the car lot in the afternoon and denied having loaned the Defendant any money to pay for the sales tax on the truck. Mr. Horne stated that he and the Defendant left for Somerville on that November night at 10:00 or 11:00 p.m. He explained that the Defendant asked him to go along to show the Defendant the location of "Flippin Street." The Defendant drove while Mr. Horne rode in the passenger seat of the truck. Before going to Somerville, the men drove around in Stanton looking for marijuana. Mr. Horne maintained that, once in Somerville, the car broke down, he and the Defendant then parked at a motel, and Mr. Horne called his girlfriend for a ride. He denied telling a police officer that he did not know his brother-in-law's name or that he was from Mason, Tennessee and renting a room at the motel. Mr. Horne also denied telling a police officer what the Defendant was wearing that night. Mr. Horne confirmed that he was never in the driver's seat of the blue truck.

Anthony Grandberry testified that he was, at the time of trial, incarcerated for a human trafficking offense. Mr. Grandberry had been incarcerated at the Fayette County jail where he came into contact with the Defendant. Mr. Grandberry explained that he was related to the Defendant "off [his] father's side." Mr. Grandberry recalled a conversation with the Defendant while the two were incarcerated:

> He told me that he had got in the store and got the cash register and the money and the police had came but his brother-in-law which is Fernando or something like that, he was behind the store asleep in the truck.
>
> . . . .
>
> He just told me he got in the store and fled away on feet when they – once he seen the police got Hernando – Fernando – his brother-in-law.

11

Following this conversation, Mr. Grandberry asked to speak with a TBI agent, "Jeff Jackson," and relayed this conversation to him. Mr. Grandberry said that he did so because, "It was the right thing to do."

On cross-examination, Mr. Grandberry agreed that he could not name one of the Defendant's family members other than the Defendant's brother, George Grandberry, whom he had met in Union City. Mr. Grandberry confirmed that he had prior convictions other than the one for which he was currently incarcerated.

Gene Smalley testified that he was the owner of the Foodland in Whiteville, Tennessee. He recalled arriving to work at around 6:20 a.m. on the morning of November 21, 2012. When he arrived, he observed a red truck parked parallel to the store in the side parking lot. Mr. Smalley parked his truck behind the red truck and walked up to the front door of the store. Mr. Smalley then returned to his truck and watched a man exit the store, get into the red truck, and drive off. Mr. Smalley identified the surveillance video footage showing the event which he had just described to the jury.

Mr. Smalley testified that the photographs shown to him of Ms. Shepherd's red truck appeared to be photographs of the same truck that he saw at his store on the morning of November 21, 2012.

David Presley, a Somerville Police Department officer, testified that, on November 21, 2012, he responded to a Gas Express in Somerville, Tennessee. Officer Presley arrived at the Gas Express at about 3:45 a.m. and observed that the front door of the business had been broken. Next, Officer Presley went to the Q Inn, approximately three hundred feet away from the Gas Express, to see who had been detained as a suspect. At the Q Inn he saw a 1996 blue GMC truck and the detainee, Mr. Horne, who Officer Presley briefly questioned. Mr. Horne told Officer Presley that he had come to Somerville with the Defendant. After speaking with Mr. Horne, Officer Presley made the decision to place Mr. Horne in custody and transport him to the Fayette County jail. Officer Presley estimated that Mr. Horne was transported "right before five a.m."

Officer Presley testified that he then proceeded to the northwest rear corner of the Somerville library where other officers had found a white cash register. The distance between the Gas Express and the back corner of the library was 566.6 feet. Officer Presley returned to the Gas Express with the cash register where Mr. Sourti confirmed that the cash register was the one taken from his store. Officer Presley returned to the jail and was interviewing Mr. Horne when he learned that Ms. Shepherd's red truck had been stolen. Officer Presley stated that the distance between the Somerville Library and Ms. Shepherd's residence was 962.7 feet.

12

Officer Presley testified that, based upon his interview with Mr. Horne at the jail, he determined that he needed to speak with Mr. Horne's girlfriend, Victoria Grandberry. Officer Presley drove to her apartment complex, Stanton Village Apartments, and found a SWAT team and the stolen red GMC truck in the parking lot. The red GMC truck was parked in front of Ms. Grandberry's apartment. Officer Presley observed that the back window of the truck was broken and there was glass in the bed of the truck. When he looked inside the vehicle, he found that the steering column on the truck had been broken. Office Presley confirmed that Mr. Horne was in custody at the Fayette County jail at the time he recovered the red GMC truck from Ms. Grandberry's apartment complex.

Officer Presley testified that he later learned that Mr. Smalley had seen the red GMC truck in Whiteville early that morning, and he reviewed the surveillance footage from Mr. Smalley's store.

On cross-examination, Officer Presley confirmed that the Defendant was not found at the Stanton Village Apartments at the time he recovered the red GMC truck.

Based upon this evidence, the jury found the Defendant guilty of burglary, theft of property valued at $500 or more but less than $1,000, vandalism less than $500, and theft of property valued at $1,000 or more but less than $10,000. At a subsequent sentencing hearing, the trial court sentenced the Defendant as a career offender to a total effective sentence of twenty-seven years in the Department of Correction.

## II. Analysis

On appeal, the Defendant asserts that the trial court erred when it ordered him to be shackled and handcuffed during the trial and failed to give a jury instruction in reference to these restraints. The Defendant further contends that the evidence is insufficient to sustain his convictions. The State responds that the trial court acted properly in determining that the Defendant should be shackled during the trial and that the evidence is sufficient to sustain the jury's verdicts. We agree with the State.

## A. Restraints Used During Trial

The Defendant challenges the trial court's decision to shackle the Defendant during the trial. The State responds that the trial court properly followed the procedure set out in *Willocks v. State*, 546 S.W.2d 819 (Tenn. Crim. App. 1976), for determining whether restraint is necessary.

In *Willocks*, this Court held that there is a legal presumption against the necessity of in-court physical restraint and that the burden falls on the State to make a clear showing of the necessity for such restraint. *Id.* at 821-22. Specifically, the State must demonstrate necessity that serves a legitimate interest, such as preventing escape, protecting those present in the courtroom, or maintaining order during a trial. *State v. Thompson*, 832 S.W.2d 577, 580 (Tenn. Crim. App. 1991). Shackling is considered inherently prejudicial to the defendant unless there is a clear showing of necessity. *Willocks*, 546 S.W.2d at 822. In this respect, the trial court: (1) should conduct a hearing; (2) must state upon the record its reasons for ordering physical restraints; and (3) must give adequate instructions to the jury that the restraint of the defendant should in no way affect their decision. *Id.* Shackles must be the least drastic security measure reasonably to suffice. *Id.*

In a more recent opinion, our Supreme Court again addressed the use of in-court restraints. *Mobley v. State*, 397 S.W.3d 70 (Tenn. 2013). The *Mobley* Court stated that trial courts should consider all relevant circumstances, "including without limitation: (1) the defendant's circumstances, such as record of past behavior, temperament, and the desperateness of his or her situation; (2) the state of the courtroom and courthouse; (3) the defendant's physical condition; and (4) whether there is a less onerous but adequate means of providing security. *Id.* at 101. The trial court should consider the relevant circumstances balanced against "affording the defendant the physical indicia of innocence, ensuring the defendant's ability to communicate with counsel, protecting the defendant's ability to participate in his or her defense and offer testimony in his or her own behalf, and maintaining a dignified judicial process." *Id.*

In the case under submission, the trial court conducted a hearing during which the State presented the Defendant's numerous and repeated acts of violence and resistance toward those in authority as well as toward fellow inmates during his incarceration. On two of the occasions discussed during the hearing, the Defendant, while incarcerated, used his hands or fists to strike a prison employee. Further, the Defendant threatened a prison employee and was cited for "creating disturbances" while in a prison facility. The record further showed that the Defendant, while incarcerated in a jail facility, assaulted both a facility employee and a fellow inmate, resulting in the need for both victims to receive medical treatment. At the hearing, the State introduced evidence of the Defendant's lengthy history of violent crimes. Finally, the Defendant shared a plan of escape with a fellow inmate in an attempt to harm his brother-in-law who would be testifying against the Defendant at trial. The Defendant described his method of escape, which was to use a bar that he had loosened from the wall. The State presented the testimony of the Sheriff's deputy who observed and photographed the bar that had been loosened in the Defendant's cell, which was evidence that was consistent with the Defendant's statement to a fellow inmate about his planned escape.

14

After hearing this evidence, the trial court made specific findings supporting its decision to implement shackles. The trial court found that the Defendant was a "dangerous person" who posed a threat to court personnel, the jury, and his attorney. In concluding that the Defendant should be shackled and handcuffed during the trial, the trial court ordered the Sheriff's deputies to make "all efforts" to conceal the use of restraints from the jury. Further, the trial court allowed the Defendant to wear civilian clothes during the trial. Finally, there is no evidence in the record that the jury ever saw the restraints used in court, therefore, a jury instruction on restraints was not necessary.

Accordingly, we conclude that the trial court considered the relevant factors and that the record supports the trial court's implementation of in-court restraints. The Defendant is not entitled to relief.

## B. Sufficiency of the Evidence

The Defendant asserts that the State failed to establish his guilt beyond a reasonable doubt as to the charges of burglary, vandalism, and theft. He characterizes the State's proof as "meager evidence" and "at best" circumstantial. The State responds that there was ample evidence presented from which the jury could find the Defendant guilty beyond a reasonable doubt of these crimes. We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

15

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978), superseded by statute on other grounds as stated in *State v. Barone*, 852 S.W.2d 216, 218 (Tenn. 1993)) (quotations omitted). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

A burglary occurs when a person enters a building, other than a habitation, with the intent to commit a felony, theft, or assault. T.C.A. § 39-14-402(a)(1) (2014). The specific intent required for a burglary may be established by circumstantial evidence. *See Bollin v. State*, 486 S.W.2d 293, 296 (Tenn. Crim. App. 1972). Additionally, when a defendant breaks and enters into a building containing valuable property with the absence of an "acceptable excuse" for doing so, a jury may "reasonably and legitimately infer . . . a defendant intends to commit theft." *State v. Ingram*, 986 S.W.2d 598, 699 (Tenn. Crim. App. 1998) (citing *Hall v. State*, 490 S.W.2d 495, 496 (Tenn. 1973)).

16

"A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." T.C.A. § 39-14-103(a) (2014). "'Knowing' means that a person acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." T.C.A. § 39-11-106(a)(20) (2014).

In order to convict the Defendant of vandalism, the State was required to prove beyond a reasonable doubt that the Defendant knowingly caused "damage to or the destruction of any real or personal property of another." T.C.A. § 39-14-408 (2014).

The evidence, viewed in the light most favorable to the State, shows that several days before the Gas Express burglary, the Defendant, accompanied by Mr. Horne, bought a blue Chevrolet truck. The Defendant's credit application for the purchase of the truck did not indicate employment. The Defendant paid $500 toward the purchase of the truck, and he borrowed an additional $300 from Mr. Horne to pay toward taxes. After the date of the burglary, the Defendant returned alone to the car lot and purchased a Tahoe, paying the full price for the vehicle in cash.

Early in the morning hours of November 21, 2012, two different police officers observed the Defendant's recently purchased blue Chevrolet truck driving around Somerville. At approximately 2:50 a.m., Officer Crawford discovered the glass front door of the Gas Express broken. An investigation of the store revealed that a cash register, cash in a green bag, a box of cartons of cigarettes, and numerous phone cards in varying amounts had been taken from the store. The store owner testified that the value of these stolen items was approximately $8,750.

As Officer Raymond stood outside the Gas Express waiting for the owner, he observed the same blue truck that had been earlier seen driving around Somerville. The truck was backed into the Q Inn approximately 300 feet away. Officer Raymond made contact with the driver of the vehicle, Mr. Horne, and found that the owner of the vehicle was the Defendant. The Defendant was also seen near the Gas Express shortly after the discovery of the break-in. After making eye contact with the Sheriff's deputy who saw him standing in front of a building near the Somerville library, the Defendant fled. The cash register taken from the Gas Express was found abandoned at the back corner of the Somerville library, 566.6 feet from the Gas Express. Thereafter, Ms. Shepherd's red GMC truck, valued between $1,000 and $10,000, was stolen from where it was parked in

front of her house, approximately 926.7 feet from the Somerville library. The same truck was later identified in Whiteville with the Defendant driving the vehicle.

We conclude that this evidence is sufficient evidence upon which a jury could conclude beyond a reasonable doubt that the Defendant broke the glass door of the Gas Express and entered the store to steal cash and valuable items totaling over $8,000. The evidence further showed that, after abandoning the cash register and being sighted nearby by a Sheriff's deputy, the Defendant fled a short distance to Ms. Shepherd's residence where he stole her red GMC truck, valued over $1,000 but less than $10,000. The Defendant is not entitled to relief.

### III. Conclusion

After a thorough review of the record and the applicable law, we conclude that the record contains sufficient evidence to support the Defendant's convictions and that the trial court did not abuse its discretion when it ordered the in-court restraint of the Defendant during the trial. Accordingly, we affirm the judgments of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE